Filed:  January 8, 2014

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 12-1369**
(1:02-cv-01168-AJT-TRJ)

─────────

UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY
AMMONS,

              Plaintiffs – Appellants,

        and

UNITED STATES OF AMERICA,

              Intervenor/Plaintiff – Intervenor,

        and

UNITED STATES ex rel. DANIEL HEUSER,

              Plaintiff,

        v.

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC
SMET,

              Defendants – Appellees,

        and

BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE
PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST
SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN
MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS
INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN
VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR
LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET
FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART
GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA
SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA SCHAFER
INTERNATIONAL SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER
INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO.
INTERNATIONALE SPEDITION KG; GILLEN & GARCON GMBH & CO. KG;
M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe;
ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND;

NICODEMUS GOSSELIN; DIETER SCHMEKEL; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; JURGEN GRAF; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GOSSELIN WORLD WIDE MOVING GMBH;VIKTORIA INTERNATIONAL SPEDITION;GOVERNMENT LOGISTICS N.V.; GATEWAYS INTERNATIONAL INCORPORATED,

Defendants.

-------------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

Amici Supporting Appellees,

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

Amicus Supporting Appellants.

———————————————

**No. 12-1417**
(1:02-cv-01168-AJT-TRJ)

———————————————

UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY AMMONS,

Plaintiffs – Appellees,

and

UNITED STATES OF AMERICA,

Intervenor/Plaintiff – Appellee,

and

UNITED STATES ex rel. DANIEL HEUSER,

Plaintiff,

v.

2

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC SMET,

    Defendants – Appellants,

        and

VIKTORIA INTERNATIONAL SPEDITION; GOVERNMENT LOGISTICS N.V.; BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO. INTERNATIONALE SPEDITION KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; JURGEN GRAF; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GATEWAYS INTERNATIONAL INCORPORATED; GOSSELIN WORLD WIDE MOVING GMBH,

    Defendants.

-----------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

    Amici Supporting Appellants,

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

    Amicus Supporting Appellees.

UNITED STATES OF AMERICA,

Intervenor/Plaintiff – Appellant,

and

UNITED STATES ex rel. DANIEL HEUSER; UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY AMMONS,

Plaintiffs,

v.

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC SMET,

Defendants – Appellees,

and

BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO. INTERNATIONALE SPEDITION KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; JURGEN GRAF; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GATEWAYS INTERNATIONAL INCORPORATED; GOSSELIN

WORLD WIDE MOVING GMBH; GOVERNMENT LOGISTICS N.V.; VIKTORIA INTERNATIONAL SPEDITION,

Defendants.

---------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

Amici Supporting Appellees,

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

Amicus Supporting Appellant.

O R D E R

The Court amends its opinion filed December 19, 2013, as follows:

On page 6, attorney information section, line 3, the name "Michael L. Woolley" is corrected to read "Michelle L. Woolley."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

5

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1369

UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY
AMMONS,

        Plaintiffs – Appellants,

    and

UNITED STATES OF AMERICA,

        Intervenor/Plaintiff – Intervenor,

    and

UNITED STATES ex rel. DANIEL HEUSER,

        Plaintiff,

        v.

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC
SMET,

        Defendants – Appellees,

    and

BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE
PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST
SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN
MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS
INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN
VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR
LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET
FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART
GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA
SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA SCHAFER
INTERNATIONAL SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER
INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO.

INTERNATIONALE SPEDITION KG; GILLEN & GARCON GMBH & CO. KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; JURGEN GRAF; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GOSSELIN WORLD WIDE MOVING GMBH;VIKTORIA INTERNATIONAL SPEDITION;GOVERNMENT LOGISTICS N.V.; GATEWAYS INTERNATIONAL INCORPORATED,

Defendants.

-----------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

Amici Supporting Appellees,

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

Amicus Supporting Appellants.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾

## No. 12-1417

‾‾‾‾‾‾‾‾‾‾‾‾‾‾

UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY AMMONS,

Plaintiffs – Appellees,

and

UNITED STATES OF AMERICA,

Intervenor/Plaintiff – Appellee,

and

2

UNITED STATES ex rel. DANIEL HEUSER,

        Plaintiff,

      v.

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC SMET,

        Defendants – Appellants,

      and

VIKTORIA INTERNATIONAL SPEDITION; GOVERNMENT LOGISTICS N.V.; BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO. INTERNATIONALE SPEDITION KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; JURGEN GRAF; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING DEUTSCHLAND GMBH; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GATEWAYS INTERNATIONAL INCORPORATED; GOSSELIN WORLD WIDE MOVING GMBH,

        Defendants.

------------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

        Amici Supporting Appellants,

3

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

Amicus Supporting Appellees.

No. 12-1494

UNITED STATES OF AMERICA,

Intervenor/Plaintiff – Appellant,

and

UNITED STATES ex rel. DANIEL HEUSER; UNITED STATES ex rel. KURT BUNK; UNITED STATES ex rel. RAY AMMONS,

Plaintiffs,

v.

GOSSELIN WORLD WIDE MOVING, N.V.; GOSSELIN GROUP N.V.; MARC SMET,

Defendants – Appellees,

and

BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG; THE PASHA GROUP; ITO MOBEL TRANSPORT GMBH; ANDREAS CHRIST SPEDITION & MOBELTRANSPORT GMBH; JOHN DOES 1-100; AMERICAN MOPAC INTERNATIONAL; DOE DEFENDANTS; GATEWAYS INTERNATIONAL; ALLIED FREIGHT FORWARDERS; NORTH AMERICAN VAN LINES, INCORPORATED; GLOBAL WORLDWIDE INCORPORATED; AIR LAND FORWARDERS SUDDATH; COVAN INTERNATIONAL; JET FORWARDING INCORPORATED; ARPIN INTERNATIONAL; BIRKART GLOBISTICS AG; THIEL LOGISTIK AG, a/k/a Logwin AG; VIKTORIA SCHAFER INTERNATIONALE SPEDITION GMBH; VIKTORIA-SKS KURT SCHAFER INTERNATIONALE GMBH & CO., KG; GILLEN & GARCON GMBH & CO. INTERNATIONALE SPEDITION KG; M.T.S. HOLDING & VERWALTUNGS GMBH, d/b/a M.T.S. Gruppe; ANDREAS CHRIST GMBH; MICHAEL VILLINGER; ERWIN WEYAND; NICODEMUS GOSSELIN; DIETER SCHMEKEL; JURGEN GRAF; HORST BAUR; KURT SCHAFER; MARTINA SCHAFER; JOHN DOE DEFENDANTS; BIRKART VERMOGENSVERWALTUNG GMBH; LOGWIN AIR + OCEAN DEUTSCHLAND GMBH; LOGWIN HOLDING

4

DEUTSCHLAND GMBH; MISSY DONNELLY; GEORGE PASHA; AMERICAN MOPAC INTERNATIONAL, INCORPORATED; AMERICAN SHIPPING INCORPORATED; CARTWRIGHT INTERNATIONAL VAN LINES INCORPORATED; JIM HAHN; INTERNATIONAL SHIPPERS ASSOCIATION INCORPORATED; GATEWAYS INTERNATIONAL INCORPORATED; GOSSELIN WORLD WIDE MOVING GMBH; GOVERNMENT LOGISTICS N.V.; VIKTORIA INTERNATIONAL SPEDITION,

Defendants.

--------------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

Amici Supporting Appellees,

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

Amicus Supporting Appellant.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:02-cv-01168-AJT-TRJ)

---

Argued: May 14, 2013          Decided: December 19, 2013

---

Before KING, SHEDD, and THACKER, Circuit Judges.

---

No. 12-1417 affirmed; No. 12-1369 affirmed in part, reversed in part, and remanded with instructions; and No. 12-1494 vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Thacker joined. Judge Shedd wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Michael T. Anderson, MURPHY ANDERSON PLLC, for United States ex rel. Kurt Bunk, United States ex rel. Ray Ammons, and United States ex rel. Daniel Heuser. Kerri L. Ruttenberg, JONES DAY, Washington, D.C., for Gosselin World Wide Moving, N.V., Gosselin Group N.V., and Marc Smet. Jeffrey Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

**ON BRIEF:** Richard E. Greenberg, John E. Petite, GREENSFELDER, HEMKER & GALE, P.C., St. Louis, Missouri; Ann Lugbill, Mark Hanna, Michelle L. Woolley, MURPHY ANDERSON PLLC, Washington, D.C., for United States ex rel. Kurt Bunk, United States ex rel. Ray Ammons, and United States ex rel. Daniel Heuser. Shay Dvoretzky, JONES DAY, Washington, D.C., for Gosselin World Wide Moving, N.V., Gosselin Group N.V., and Marc Smet. James M. Spears, Melissa B. Kimmel, PHRMA, Washington, D.C.; David W. Ogden, Jonathan G. Cedarbaum, Nicole Ries Fox, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Pharmaceutical Research and Manufacturers of America. Robin S. Conrad, Rachel Brand, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C.; M. Miller Baker, McDERMOTT WILL & EMERY LLP, Washington, D.C.; Joshua Buchman, Peter Schutzel, McDERMOTT WILL & EMERY LLP, Chicago, Illinois, for Chamber of Commerce of the United States of America. Kristin L. Amerling, Cleveland Lawrence III, TAXPAYERS AGAINST FRAUD EDUCATION FUND, Washington, D.C.; Colette G. Matzzie, Claire M. Sylvia, PHILLIPS & COHEN, LLP, Washington, D.C., for Taxpayers Against Fraud Education Fund. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Stuart F. Delery, Acting Assistant Attorney General, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

---

6

KING, Circuit Judge:

These appeals and cross-appeal are taken from final judgments, entered in accordance with Federal Rule of Civil Procedure 54(b), in a pair of qui tam actions consolidated for litigation in the Eastern District of Virginia. By its Order of February 14, 2012, the district court: (1) assessed a single civil penalty in the sum of $5,500 in favor of the United States, intervening in substitution of relator Ray Ammons, as to a single portion of its claim pursuant to the False Claims Act (the "FCA"), which it alleged against defendants Gosselin Worldwide Moving, N.V., Gosselin Group N.V., and the latter's CEO, Marc Smet (collectively, "Gosselin" or the "company"); (2) decreed judgment for Gosselin on the remainder of the FCA claim, as well as common law claims asserted by the government in the same action; (3) granted judgment as to liability with respect to a single FCA claim alleged by relator Kurt Bunk and against Gosselin in the second action; but (4) denied Bunk recovery of civil penalties on that claim.

The primary issue before us is whether the district court erred in determining that, concerning 9,136 false invoices at the heart of Bunk's claim, any award under the FCA must necessarily exceed more than $50 million. The court ruled that such an assessment would contravene the Excessive Fines Clause of the Eighth Amendment, and it thus awarded nothing. We must

7

also decide whether, as to the larger portion of the government's FCA claim on which Gosselin prevailed, the court properly declared the company immune under the Shipping Act. Gosselin, for its part, urges on cross-appeal that Bunk's election to seek civil penalties to the exclusion of actual damages deprives him of standing to maintain any recovery — even one consistent with the Eighth Amendment.

We conclude that Bunk possessed standing to sue for civil penalties while bypassing the prospect of a damages award, and we thus affirm the district court's judgment in his favor. To the extent, however, that the court denied Bunk recovery of any penalties, we reverse and remand for entry of his requested award of $24 million, an amount that we deem to be consistent with the Constitution. Finally, we are of the opinion that the Shipping Act confers no immunity upon Gosselin for any part of the government's FCA claim; we therefore vacate the contrary ruling in favor of Gosselin and remand the misadjudicated portion of the claim for further proceedings.

I.

A.

1.

An army may march on its stomach, but when a fighting force is deployed to a foreign front, familiar furnishings also serve

8

to fuel the foray.  The Department of Defense (the "DOD") seeks to provide its armed military forces and civilian personnel with the orderly and efficient transport of their goods and effects across the Atlantic, point to point within Europe, and back home again.   The DOD thus instituted the International Through Government Bill of Lading program (the "ITGBL program") to govern transoceanic moves, while relying on the Direct Procurement Method (the "DPM") to contract for transport strictly on the European continent.   Both methodologies were administered by the DOD's Military Traffic Management Command (the "MTMC").[1]

In the ITGBL program, the MTMC solicited domestic vendors — often referred to as "freight forwarders" —  to bid on one or more "through rates," i.e., unitary prices for moving household goods along shipping channels established between the several states and the particular European countries in which American personnel were encamped.   Channels were further distinguished based on which of the respective termini was the origin of the goods.   For example, the Virginia-to-Germany channel was bid apart from the Germany-to-Virginia channel.

---

[1]  The MTMC is now called the Surface Deployment and Distribution Command, or the SDDC.

The successful bidders contracted with the MTMC to supply door-to-door service, typically consisting of discrete segments: packing the goods at the origin; land carriage to the ocean port; origin port services; ocean transport; destination port services; and carriage overland to the destination, where the goods were unpacked. Subcontractors, including Gosselin, provided services in connection with the European segments, and the prices quoted by those subcontractors were taken into account by the freight forwarders. The MTMC dealt on an individual basis with some of these same subcontractors when it availed itself of the DPM to obtain packing, loading, and transportation services exclusively within Europe.

On November 14, 2000, Gosselin met in Sonthofen, Germany, with a number of its industry peers, some that provided services in multiple European segments and others that were more locally focused. Together, these entities controlled the lion's share of packing and transportation services within Germany. The meeting participants agreed to charge a non-negotiable minimum price for these local services, which would also be incorporated into the fixed "landed rate" quoted to the freight forwarders for servicing multiple segments. Apart from its intended effect upon the ITGBL program, the Sonthofen meeting and resultant agreement arguably served as a catalyst with respect to an ongoing DPM scheme. Pursuant to that scheme, Gosselin was

10

awarded a contract, effective May 1, 2001, after colluding with its fellow bidders to artificially inflate the packing and loading component of the submitted bids. Thereafter, Gosselin subcontracted much of the work, in predetermined allocations, to its supposed competitors.

Despite the efforts of Gosselin and its Sonthofen cohorts, freight forwarder Covan International, Inc., was able to submit, at initial filing for the ITGBL International Summer 2001 ("IS01") rate cycle, the low bid on fourteen channels between Germany and the United States (the "Covan Channels"). In order to increase the likelihood of obtaining business in those channels, other freight forwarders such as the Pasha Group, with which Gosselin had a continuing relationship, would have been compelled to match Covan's prime through rate. Instead, Gosselin threatened to withdraw financing from Covan for the latter's purchase of thousands of lift vans required to fulfill its contractual obligations with the MTMC. Consequently, Covan cancelled its bid, and Gosselin spread the word among the freight forwarders that each should, during the second ("me-too") phase of the bidding, match only the second-lowest bid on the Covan Channels.

2.

The foregoing scenario was virtually duplicated one year later, during bidding for the IS02 cycle. On that occasion,

11

Cartwright International Van Lines, Inc., successfully bypassed the established landed rates to submit the low bid on twelve Germany-U.S. channels (the "Cartwright Channels"). Gosselin and Pasha, however, convinced Cartwright to withdraw its bid, and, after ensuring that local agents would refuse services to anyone who failed to cooperate, they secured agreements from Pasha's fellow freight forwarders to echo the second-lowest bid. For their actions in connection with the Cartwright Channels, the Gosselin and Pasha corporate entities were each convicted of federal criminal offenses in the Eastern District of Virginia. See United States v. Gosselin World Wide Moving, N.V., 411 F.3d 502 (4th Cir. 2005).

B.

The above-described acts gave rise to the underlying civil actions premised on the FCA, 31 U.S.C. §§ 3729-3733, which, during the events in question, provided in pertinent part:

(a) Any person who —

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claims paid or approved by the Government; [or]

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[,]

12

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

Id. § 3729(a).[2] The FCA confers on private persons, such as Bunk and Ammons, the authority to "bring a civil action for a violation of section 3729 for the person and for the United States Government" in the government's name. Id. § 3730(b)(1).[3]

Bunk sued in the Eastern District of Virginia on August 2, 2002, asserting claims arising from the DPM scheme. Ammons's lawsuit, stemming from the machinations relating to the ITGBL program, was initiated on September 17, 2002, in the Eastern District of Missouri. The two actions were commenced under seal against Gosselin and a long list of other defendants, all but one of which have since been dismissed via settlement and otherwise. Advancement of both lawsuits was deferred pending the final outcome of the criminal investigation and resultant

---

[2] The FCA was revised in 2009 to clarify and flesh out many of its provisions. The bases relied on in § 3729(a) to establish Gosselin's potential liability, however, remained substantially the same.

[3] The heading of § 3730(c) refers to a proceeding initiated under the FCA as a "qui tam" action, which has been defined as one "under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive. They are usually reported as being in the name of the government ex rel. ([i.e.,] on the relation of) the private citizen." Bryan A. Garner, A Dictionary of Modern Legal Usage 728-29 (2d ed. 1995).

13

proceedings. See § 3730(b)(2), (3) (prescribing that relator's complaint "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders"). On November 9, 2007, the Ammons matter was transferred to the Eastern District of Virginia, where it was consolidated with the Bunk proceeding.

Bunk accused Gosselin of participating in an unlawful conspiracy to defraud the MTMC. His operative Third Amended Complaint (the "Bunk Complaint"), filed December 8, 2009, alleged that the conspirators saw their illicit plans bear fruit when they "falsely represented, directly or indirectly, in submitting claims for payments that they had not engaged in common discussions or agreements regarding prices to be offered and terms and conditions of service," such terms and conditions including "allocation of territories or market share . . . for work performed under . . . [DPM] Government contracts . . . for transportation of military personal property." Bunk Complaint ¶ 136.[4]

In a similar fashion, the Complaint filed by Ammons (the "Ammons Complaint") asserted, inter alia, that Gosselin facilitated "a bid rigging scheme," in furtherance of which it

---

[4] The Bunk Complaint is found at J.A. 294-340. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.)

14

and Pasha illegally "control[led] the access to German freight agents for [ITGBL] origin and destination services[.]" Ammons Complaint ¶¶ 50, 61.[5] This monopoly of access, according to Ammons, enabled the conspirators to "raise and control the prices for a critical feature of the services necessary to service the traffic channel between Germany and the United States." Id. ¶ 61.

The Ammons Complaint was superseded on July 18, 2008, by the United States' Complaint in Intervention (the "Government Complaint"). See 31 U.S.C. § 3730(b)(2) ("The Government may elect to intervene and proceed with the action.").[6] The material allegations of the Government Complaint echoed those of its Ammons predecessor, in particular the asserted purpose of the conspiracy, which "was to obtain collusive, artificially inflated, and noncompetitive prices for transportation services performed in connection with [ITGBL] international household goods shipments." Government Complaint ¶ 6. To advance the illicit aims of the conspiracy, according to the government, Gosselin knowingly "submitted or caused to be submitted false and inflated claims for payment to the United States . . . and

---

[5] The Ammons Complaint is found at J.A. 243-58.

[6] The Government Complaint is found at J.A. 263-93.

made, used or caused to be made or used false records or statements to get those claims paid or approved." Id.[7]

The government thus maintained that Gosselin was liable under the FCA for treble damages and civil penalties, see Government Complaint ¶¶ 87-93 (First Cause of Action), or, in the alternative, for common law fraud, for conspiracy to defraud the United States, and for unjust enrichment, see id. ¶¶ 94-108 (Second through Fourth Causes of Action). Bunk, for his part, pleaded various FCA theories of liability against Gosselin and others. See Bunk Complaint ¶¶ 145-59 (Counts I through V). Suing in his individual capacity, Bunk joined several additional claims, including a 42 U.S.C. § 1985 claim for conspiracy to

---

[7] Though subordinated as a result of the government's intervention, Ammons remained in the suit, maintaining his status as a party-plaintiff. See 31 U.S.C. § 3730(c)(1) ("[T]he person bringing the action . . . shall have the right to continue as a party to the action."). Bunk's role was unchanged, as the government declined to intervene in his proceeding. See id. § 3730(c)(3) ("If the government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action."). The government's decisions as to intervention bear not only on who conducts the litigation in the respective matters, but also the eventual award, if any, to the relator. Compare id. § 3730(d)(1) (providing that where "the Government proceeds with an action brought by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim"), with id. § 3730(d)(2) ("If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount . . . not less than 25 percent and not more than 30 percent of the proceeds.").

interfere with his civil rights, see id. ¶¶ 160-62 (Count VI), and state law claims for tortious interference with contractual relations, for antitrust and related violations, and for defamation, see id. ¶¶ 163-75 (Counts VII through IX).[8]

### C.

On the basis of the prior criminal proceedings against Gosselin, the district court granted partial summary judgment on liability to the government on its FCA claim insofar as it pertained to the Cartwright Channels. The remaining issues in the consolidated matters were tried in Alexandria before a jury, beginning on July 18, 2011. The government explained in its opening statement that Gosselin, pursuant to the conspiracy engendered by the Sonthofen Agreement, engaged in two general types of wrongful conduct: (1) unlawfully colluding with its industry cohorts to inflate the landed rate component of ITGBL bids involving all German channels, which caused those bids as a whole — and the resultant DOD payments — to be higher than they would have been absent such collusion (the "price-fixing" conduct); and (2) in concert with Pasha and others, improperly

---

[8] Although the government did not intervene in the Bunk proceeding, the district court determined that all of Bunk's claims had nonetheless been effectively superseded by the Government Complaint, except for Count II of the Bunk Complaint, which sought recovery under the FCA for Gosselin's actions in connection with the DPM scheme. The court's ruling in that regard has not been appealed.

17

influencing Covan and Cartwright to withdraw their initial low bids in the IS01 and IS02 cycles, respectively, and dissuading its competitors from matching the Covan and Cartwright bids in the affected channels (the "bid-rigging" conduct). See Transcript of Trial, July 18, 2011, at 54-58. For these asserted misdeeds, the government sought both categories of redress permitted by § 3729(a), that is, a fixed civil penalty for each false claim, plus three times the amount of actual damages it had sustained. Bunk, by contrast, chose to forgo proof of damages, suing only for civil penalties.

At the close of the government's case-in-chief, on July 28, 2011, the district court granted in part Gosselin's motion for judgment as a matter of law, concluding that the company was entitled to immunity under the Shipping Act, and it therefore could not be held accountable under the FCA for its price-fixing conduct. See Fed. R. Civ. P. 50(a). That conduct, the court explained, was the only basis for imposing liability on Gosselin for the inflated landed rate affecting all ITGBL channels starting and ending in Germany, and not merely the Covan and Cartwright Channels that were the sole bid-rigging targets. The court likewise awarded judgment to Gosselin on the alternative, common law claims, with the result that the only portion of the government's case permitted to proceed was its FCA claim, and

18

that only insofar as it related to Gosselin's bid-rigging conduct directed at Covan and Cartwright.

Conversely, the district court denied Gosselin's motion for judgment as a matter of law with respect to Bunk's claim premised on the DPM scheme. The court explained that the conduct engendering FCA liability as to that claim was not grounded in immunized price-fixing, but instead manifested in the subsequent Certificate of Independent Price Determination (the "CIPD") filed by Gosselin. The CIPD was designed to affirmatively assure the MTMC that the successful DPM contractor had not discussed pricing or soliciting strategy with other potential suppliers. Bunk had adduced evidence at trial, the court recalled, that Gosselin had met with its competitors "and agreed on prices that would be charged and who would service territories regardless of who was awarded the contract." Transcript of Trial, July 28, 2011, at 1059. That evidence created "a triable issue for the jury" as to whether Gosselin "acted in a way inconsistent with its certification," and, assuming that the CIPD was false, "whether it was a material misstatement and whether [it was made] knowingly." Id. at 1059-60.

Gosselin proceeded with its defense, followed by rebuttal from Bunk and from the government. At the conclusion of all the evidence, the jury was instructed by the district court, heard

19

the parties' closing arguments, and retired to consider its verdict. On August 4, 2011, after about nine hours of deliberations over two days, the jury returned a verdict in favor of Gosselin as to that portion of the government's FCA claim stemming from the Covan Channels. In regard to the Cartwright portion of the FCA claim, for which the district court had previously ruled Gosselin liable as a matter of law, the jury found that the government had proved 4,351 instances of false or fraudulent claims. Finally, the jury found Gosselin culpable under the FCA for its role in the DPM scheme, as set forth in Count II of the Bunk Complaint.

D.

1.

Through its memorandum opinion of October 19, 2011, the district court disposed of various post-trial motions filed by the parties. First, the court deemed the evidence insufficient to support the jury's finding of 4,351 false claims in connection with the Cartwright Channels; it thus granted Gosselin partial judgment as a matter of law, or, alternatively, a new trial on the civil penalties remedy pertaining to the government's First Cause of Action. See Fed. R. Civ. P. 50(c)(1). We characterize the judgment as "partial" because the district court declined to decree that the government recover nothing. To the contrary, in line with its prior ruling

20

regarding the Cartwright Channels, the court entered judgment for the United States in the sum of $5,500. The amount of the judgment reflects the court's conclusion that the whole of Gosselin's bid-rigging misconduct established nothing more than a baseline false claim, for which the government — in the absence of more sophisticated proof — was entitled to receive only a single civil penalty.[9]

Moving on to consider the damages remedy, the district court observed that the government had collected approximately $14 million from settling codefendants. That amount was far in excess of the presumptive damages, i.e., the $865,000 that Gosselin paid as restitution in the criminal proceedings, such liability under the FCA being increased to $2,595,000 upon application of the trebling modifier. The court thus decided that Gosselin was entitled to a full offset, with no damages remaining payable. Lastly, the court denied Gosselin's motion for judgment as a matter of law with respect to Count II of the Bunk Complaint and held Gosselin liable for 9,136 false claims,

---

[9] See United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 920 (4th Cir. 2003) (ascertaining defendant liable for twenty-six false claims, consisting of initial fraudulent certification plus twenty-five resultant invoices). The government has not appealed the district court's Rule 50(c) determination as to the number of Cartwright Channel claims.

21

corresponding to the number of invoices stipulated by the parties to have been submitted under the DPM contract.

2.

It remained for the district court to calculate the appropriate civil penalties for the Bunk false claims. Treating each of the 9,136 claims as a discrete basis for liability under § 3729(a), imposition of no more than the statutory minimum of $5,500 would have resulted in a cumulative penalty just in excess of $50 million ($50,248,000).[10] Gosselin contended that a multi-million-dollar award would be grossly out of proportion to its misconduct, and thus in contravention of the constitutional proscription against excessive fines. See U.S. Const. amend. XIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

The district court agreed, and by memorandum opinion of February 14, 2012, expressed its view that the relatively isolated harm caused by the DPM scheme, under which the government paid a total of approximately $3.3 million for the

---

[10] Pursuant to 28 C.F.R. § 85.3(a)(9), persons adjudged liable under the FCA are, as of September 29, 1999, subject to increased civil penalties amounting to a minimum of $5,500 and a maximum of $11,000. See Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 535, 104 Stat. 890 (1990), as amended by Pub. L. 104-134, 110 Stat. 131 (1996) (directing that agency heads adjust and publish via regulation certain civil penalties).

packing and loading line item, could not justify a $50 million penalty. Concluding that it was unauthorized by the FCA to award less than the $5,500 minimum per claim, and, further, that each of the 9,136 claims required an award, the court rejected Bunk's proposal, in consultation with the government, to accept $24 million in settlement of the judgment. Indeed, the court concluded in the alternative that, under the circumstances, any penalty in excess of $1.5 million would be constitutionally excessive, and in the event the statute permitted an assessment of less than $50,248,000, it would award $500,000.

The district court directed the entry of final judgment as to the claims set forth in the operative complaints against Gosselin.[11] Encapsulating the various jury findings and legal rulings set forth above, the court ordered:

> (1) judgment in favor of the Plaintiff the United States of America and against Defendants [Gosselin],

---

[11] See Fed. R. Civ. P. 54(b) (instructing that "[w]hen an action presents more than one claim . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . if the court expressly determines that there is no just reason for delay"). The court deferred decision on the relators' claims for a percentage of the government's recovery, together with their requests for FCA attorney fees from Gosselin, pending final disposition of this appeal. Also left pending is the fate of the lone remaining defendant in the case, Government Logistics, N.V., which was alleged liable as a successor to Gosselin. The court denied the parties' cross-motions for summary judgment as to the successor liability question, holding it over for eventual determination by trial.

jointly and severally, in the amount of Five Thousand, Five Hundred Dollars ($5,500), on the First Cause of Action in the [Government] Complaint . . . ; (2) judgment in favor of Defendants [Gosselin] and against the Plaintiff the United States of America on the Second, Third, and Fourth Causes of Action in the [Government] Complaint . . . ; (3) judgment in favor of [Bunk] and against the Defendants [Gosselin] as to liability on Count II of the [Bunk] Complaint; and (4) judgment in favor of Defendants [Gosselin] and against the United States of America and [Bunk] as to civil penalties on Count II of the [Bunk] Complaint.

J.A. 1621.

By notice timely filed on March 13, 2012, Bunk and Ammons jointly appealed the district court's Rule 54(b) judgment (No. 12-1369). Thereafter, on March 27, 2012, Gosselin cross-appealed (No. 12-1417). The government noticed its appeal (No. 12-1494) on April 13, 2012.[12] We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Intricate issues of law underlie the judgment below and permeate these several appeals. Most of the issues concern the construction and application of federal statutes in a fashion

---

[12] In the typical civil case, a party seeking to appeal must file notice thereof in the district court "within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a)(1)(A). If, however, "one of the parties is . . . the United States," or an agency or official representative thereof, "any party" to the litigation may appeal within 60 days following the entry of the judgment or order at issue. Id. 4(a)(1)(B).

24

consistent with the Constitution.  These legal issues were, with certain exceptions identified below, considered and decided in the first instance by the district court, whose rulings thereon we review de novo.  See United States v. Under Seal, 709 F.3d 257, 261 (4th Cir. 2013) (deeming questions of statutory interpretation and constitutional challenges subject to de novo review).

### III.

### A.

#### 1.

Gosselin suggests that Bunk lacks standing to sue, thereby challenging the jurisdiction of the federal courts as to that portion of the consolidated litigation in which the government has not intervened.  See U.S. Const. art. III, § 2 (limiting judicial power of United States solely to adjudication of cases and controversies).  We thus turn our attention at the outset to Gosselin's cross-appeal.  See United States v. Day, 700 F.3d 713, 721 (4th Cir. 2012) ("[C]ourts must resolve jurisdictional Article III standing issues before proceeding to consider the merits of a claim.").  According to Gosselin, Bunk's decision to bypass proof of actual damages and instead seek only civil penalties demonstrates that he suffered no injury in fact caused by Gosselin, such being an essential component of standing.  See

25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (observing that "irreducible constitutional minimum of standing contains three elements," i.e., injury in fact, traceability of injury to defendant's conduct, and redressability); *accord Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

The Supreme Court's decision in <u>Vermont Agency</u> is dispositive of the question. Therein, Justice Scalia, writing for the Court, reiterated that "[a]n interest unrelated to injury in fact is insufficient to give a plaintiff standing." 529 U.S. at 772. The Court nevertheless instructed "that adequate basis for the relator's suit . . . is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." <u>Id.</u> at 773. The relator provisions of the FCA suffice in that regard, the Court reasoned, insofar as they occasion a "partial assignment of the Government's damages claim." <u>Id.</u> This assignment in part, especially when viewed in the context of the long tradition of qui tam actions — originating in England about 500 years before the ratification of the Constitution — <u>see</u> <u>id.</u> at 774-75,

"leaves no room for doubt that a <u>qui tam</u> relator under the FCA has Article III standing." <u>Id.</u> at 778.[13]

Gosselin, however, seizes upon the Supreme Court's characterization of an FCA action as alleging both an "injury to [the government's] sovereignty arising from violation of its laws" and a "proprietary injury resulting from the alleged fraud," 529 U.S. at 771, asserting that the civil penalties provision redresses strictly the former, with damages payable dollar for dollar to remedy the latter. Gosselin suggests that only the proprietary injury is an injury in fact for standing purposes, and it relies for support on the <u>Vermont Agency</u> language quoted in the preceding paragraph, pointing out that Justice Scalia spoke only of the FCA assigning the "damages claim" on behalf of the government. Thus, the argument goes, Bunk's election to forgo proof of damages and pursue penalties solely for the government's sovereignty injury — purportedly non-assignable — strips him of standing to maintain suit and thereby moots his portion of the case. <u>See</u> <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 68 n.22 (1997)

---

[13] The Supreme Court's invocation of the principle of assignment to establish relators' standing under the FCA is sufficient to distinguish <u>Lujan</u> and analogous authorities relied on by Gosselin, in which plaintiffs suing to vindicate exclusively their own rights were required to have themselves sustained a palpable injury in fact.

27

("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must commence at the outset of the litigation . . . must continue throughout its existence." (citations and internal quotation marks omitted)).

We are scarcely convinced that the Supreme Court in <u>Vermont Agency</u> would have embarked by mere implication on the novel dissection urged by Gosselin, without so much as a nod that it was breaking new ground. The judgment entered below, unchallenged on its merits, confirms that the government sustained injury by virtue of Gosselin's conduct, and it is "the United States' injury in fact," without reference to the source of that injury, that the Court has said "suffices to confer standing" on FCA relators like Bunk, who is not otherwise alleged unqualified. <u>See</u> <u>Vermont Agency</u>, 529 U.S. at 774. That Bunk made a tactical decision during the course of litigation to pursue only civil penalties altered in no material way the fundamental legal relationship among him as plaintiff and assignee, Gosselin as defendant and tortfeasor, and the government as victim and assignor.

Moreover, in documenting the use of qui tam actions over the centuries to buttress the concept of relator standing, the <u>Vermont Agency</u> Court discussed so-called "informer" statutes that had been enacted in England and, later, in the American

28

colonies. These statutes, designed to redress a host of wrongs such as piracy, privateering, and horse thievery, "allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves." See 529 U.S. at 775-77 & nn. 6-7. We think it highly unlikely that the Court would have relied on the informer statutes to reach the result it did in Vermont Agency had it intended future relators, such as Bunk, seeking precisely the same sorts of penalty bounties, to be without standing to sue.

Successful FCA relators can and do recover both damages and civil penalties. See 31 U.S.C. § 3729(a) (specifying defendant's liability "for a civil penalty . . . plus 3 times the amount of damages" sustained by the government (emphasis added)). The two remedies were thus designed to be unitary, or at least complementary. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 551-52 (1943) (ascertaining that dual remedy provisions facilitate the "chief purpose" of the FCA to ensure "that the government would be made completely whole," and acknowledging the problem Congress confronted in "choosing a proper specific sum which would give full restitution"). Exemplifying the intended synergy, the penalty provision fulfills a function similar to that of the damages multiplier. Cf. United States v. Bornstein, 423 U.S. 303, 315 (1976) (touting usefulness of multiplier "to compensate the Government

29

completely for the costs, delays, and inconvenience occasioned by fraudulent claims"). As the court of appeals emphasized in United States ex rel. Main v. Oakland City University, 426 F.3d 914, 917 (7th Cir. 2005), the FCA "provides for penalties even if (indeed, especially if) actual loss is hard to quantify."

The practical integration of the remedial provisions strongly suggests that they should not be evaluated in isolation for standing purposes. This seems all the more so when one also considers the similar integration between FCA relators and the government; the statute provides that both share in the ultimate recovery regardless of which directs the litigation. To deny a relator its bounty on the ground that it cannot pursue penalties alone would be to deny the United States due recompense, or, in the alternative, to deprive the government of its choice to forgo intervention. We decline Gosselin's invitation to interpret the FCA in a manner that disrupts the statute's careful design. In holding that relators seeking solely civil penalties enjoy standing to sue, we find ourselves in agreement with the two other circuits that have decided the issue. See United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 804 (10th Cir. 2002), rev'd on other grounds, 549 U.S. 457, 479 (2007); Riley v. St. Luke's Episcopal Hosp., 252 F.3d 749, 752 n.3 (5th Cir. 2001) (en banc).

Gosselin presses on, insisting that if Bunk's standing depends on Congress having assigned him the right under the FCA to seek redress for the government's sovereign injury, such an action by the legislative branch contravenes Article II of the Constitution, specifically the Appointments Clause and the Take Care Clause. The former confers on the President the exclusive authority to appoint all "Officers of the United States," except those who require "the Advice and Consent of the Senate" or whose appointment Congress otherwise vests "in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The latter mandates that the President "take Care that the Laws be faithfully executed." Id. art. II, § 3. Gosselin contends that Congress, through the FCA, has effectively appointed Bunk an officer of the United States. This alleged usurpation of the President's constitutional role, the argument goes, has further resulted in Bunk impermissibly wielding the power reserved to the executive to penalize Gosselin's violation of federal law.

Being derivative of the failed threshold assault on relator standing pursuant to Article III of the Constitution, the more nuanced Article II attacks on the FCA were purposely and pointedly left unresolved by the Supreme Court in Vermont Agency. Justice Scalia was careful to note that the Court

"express[ed] no view" on the constitutionality of the FCA under the Appointments and Take Care Clauses, because the statute was not contested on either of those bases. See 529 U.S. at 778 n.8. Importantly for our purposes, however, the Court recognized that "the validity of qui tam suits under those provisions," in contrast to the standing afforded the relator to bring suit, was not "a jurisdictional issue" requiring analysis and decision. Id.

The same is true here. Gosselin's constitutional challenges to the FCA are newly raised in its cross-appeal, having never been presented to the district court for consideration in the first instance. Although the question of Bunk's standing strikes at the heart of federal jurisdiction limited under Article III to cases and controversies, whether the FCA contravenes Article II does not.

As one of our esteemed colleagues has aptly observed, "it remains the law of this circuit that when a party to a civil action fails to raise a point at trial, that party waives review of the issue unless there are exceptional or extraordinary circumstances justifying review." Corti v. Storage Tech. Corp., 304 F.3d 336, 343 (4th Cir. 2002) (Niemeyer, J., concurring) (collecting cases). We discern no compelling reason to depart from the usual rule in this case. See Singleton v. Wulff, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken

32

up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals."). The Vermont Agency Court exercised its discretion to withhold ruling on the Article II challenges not properly before it, and, under similar circumstances, we do the same.

B.

1.

We move on to address Bunk's appeal of the district court's ruling that it lacked authorization to enter judgment against Gosselin on the 9,136 false claims for civil penalties amounting to less than $50 million and change (insofar as $248,000 can be considered "change"), notwithstanding that Bunk was willing to accept a remittitur to $24 million. Bunk suggests that, to the extent the district court correctly concluded that the Eighth Amendment is contravened if the full force of the FCA is brought to bear on Gosselin, the statute can nonetheless be reformed within constitutional tolerances by imposing a civil penalty on fewer claims than proved or stipulated; the same result could be obtained by disregarding the $5,500 floor per claim. In support of the reformation approach, Bunk points to Ayotte v. Planned Parenthood of Northern New England, in which the Supreme Court explained that "when confronting a flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while

33

leaving other applications in force." 546 U.S. 320, 328-29 (2006). We are content to leave the FCA as it is, however, by reaching the same result another way.

We begin with the proposition that litigation usually commences to redress a perceived wrong against one or more private persons or entities, or the public at large. As a society, we seek to encourage this structured, civilized form of dispute resolution, so it makes sense that parties availing themselves of the courts to sue possess considerable latitude — so far as may be fair to the defendant — over how the suit progresses and ultimately culminates. In the normal course, the plaintiff or prosecutor determines the claims or charges to bring, how much discovery or investigation is reasonable to undertake, the evidence and testimony introduced to sustain the burden of proof, and whether to initiate or accept an offer of compromise.

The primacy of the complaining party is reflected in the legal vernacular. We often speak of the civil plaintiff being the "master of his complaint." See, e.g., Lincoln Prop. Co. v. Roche, 546 U.S. 81, 91 (2005) ("In general, the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue." (citation and internal quotation marks omitted)); Johnson v. Advance Am., 549 F.3d 932, 937 (4th Cir. 2008) (acknowledging that "plaintiffs, as masters

34

of their complaint, can choose to circumscribe their class definition" to escape federal jurisdiction under Class Action Fairness Act); Pueschel v. United States, 369 F.3d 345, 356 (4th Cir. 2004) (explaining that claim raised in prior proceedings but not adjudicated was subsequently precluded because plaintiff was responsible "as the master of her complaint, to make sure that the district court identified all of her claims"). Similarly, in the criminal context, it is taken for granted that prosecutors enjoy substantial discretion with regard to the persons and offenses they elect to charge. See Bordenkircher v. Hayes 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

It is hardly surprising, then, that the FCA was crafted in acknowledgment of the flexibility typically afforded the government to right a public wrong. At the threshold, the United States is vested with the discretion to file or forgo suit. See 31 U.S.C. § 3730(a) (providing that, after diligent investigation, "[i]f the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person (emphasis added)). If a relator initiates suit, then the

35

government "<u>may</u> elect to intervene and proceed with the action." <u>Id.</u> § 3730(b)(2) (emphasis added). Upon intervention and notwithstanding the objection of the relator, the government may, after a hearing before the court, dismiss or settle the suit, <u>see</u> <u>id.</u> § 3730(c)(2)(A)-(B), prerogatives that, absent intervention, inhere in either the government or a relator suing as the government's assignee.

By requesting the district court to enter judgment for a reduced amount of $24 million on the claims he brought, Bunk, as the government's assignee, was merely exercising his discretion to attempt to bring the case to a suitable conclusion following the jury's verdict in his favor. A dispute can be settled, of course, at any time before litigation has commenced, during its pendency, or after it has finished. And settlements often take the form of a consent judgment. Bunk's proposal, being unilateral, was not a settlement. It was, however, doubtlessly intended to make the prospect of settlement more palatable for Gosselin, or — failing that immediate resolution — to smooth Bunk's path before the district court and on appeal against the looming Eighth Amendment challenge.

In short, Bunk's effort at a voluntary remittitur was just the sort of arrow that a plaintiff is presumed to possess within his quiver. It must be the rare case indeed where the plaintiff prevails before a jury, then, under no overt influence from the

36

court or the defendant, elects to take a lesser judgment before the ink has dried on the verdict form. Nevertheless, we imagine that the plaintiff's discretion to willingly do so is virtually unbounded. In United States v. Mackby, 339 F.3d 1013 (9th Cir. 2003), the district court entered judgment against the defendant under the FCA for treble damages in excess of $174,000 stemming from 1459 false claims. Although the defendant was also liable for civil penalties on each claim, the court, at the government's request, assessed the $5,000 minimum on only 111 of the claims to add $555,000 to the judgment. Neither the court nor the defendant questioned the government's discretion to proceed in such a manner. Accord Peterson v. Weinberger, 508 F.2d 45, 55 (5th Cir. 1975) (approving entry of judgment on civil penalties for only 50 of 120 false claims "where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government").

By our observations, we do not mean to imply that a district court is at the mercy of either the government or a relator in an FCA proceeding. Quite the opposite is true: the court remains in firm control of those aspects of the litigation over which it has always had domain, including without limitation scheduling and discovery, the admission and exclusion of evidence, and the conduct of trial. But the court must permit the government or its assignee the freedom to navigate

37

its FCA claims through the uncertain waters of the Eighth Amendment.

We reluctantly acknowledge that the perceived tension between the FCA and the Excessive Fines Clause of the Eighth Amendment, which so understandably concerned the district court, is a monster of our own creation. The FCA as enacted could arguably have been construed as authorizing a total civil penalty not to exceed $11,000 (in addition to treble damages) against anyone planning or executing a scheme to defraud the government. See 31 U.S.C. § 3729(a) (providing that any person presenting, facilitating through certain means, or conspiring to present government with a false or fraudulent claim "is liable to the United States Government for a civil penalty" now ranging from $5,500 to $11,000 (emphasis added)).

We eschewed such a narrow interpretation, however, in Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999) ("Harrison I"), a relator's appeal from the district court's dismissal order, wherein the defendant was alleged to have misrepresented costs and withheld disclosures to obtain subcontracting approval from the government. With respect to the defendant's requests for reimbursement of its payments to the subcontractor, we concluded that the FCA "attaches liability, not to the underlying fraudulent activity . . . but to the claim for payment." Harrison I, 176 F.3d at 785

38

(citation and internal quotation marks omitted). Moreover, "each [invoice] constitutes a claim under the False Claims Act," id. at 792, on the ground that these invoiced "claim[s] for payment . . . [were] . . . submitted under a contract which was fraudulently approved," id. at 793-94. In so ruling, we took note of substantial amendments to the FCA thirteen years earlier, reflecting the determination of Congress to "'enhance the Government's ability to recover losses sustained as a result of fraud.'" Id. at 784 (quoting S. Rep. No. 99-345, at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266)).

That approach proved just the tonic in the Harrison cases, where, it would turn out, the defendant was penalized nearly $200,000 for submitting twenty-five false invoices. See United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913, 920 (4th Cir. 2003) ("Harrison II"). It was inevitable, we suppose, in view of the vast number of government contracts — many of prodigious size and sophistication — that we would confront FCA actions involving thousands of invoices, thus exposing culpable defendants to millions of dollars of liability for civil penalties. We are entirely comfortable with that proposition. When an enormous public undertaking spawns a fraud of comparable breadth, the rule set forth in Harrison I helps to ensure what we reiterate is the primary purpose of the

FCA: making the government completely whole. See Harrison II, 352 F.3d at 923 (citing Hess, 317 U.S at 551-52).

The district court's methodology cannot be said to have furthered that statutory purpose. Indeed, an award of nothing at all because the claims were so voluminous provides a perverse incentive for dishonest contractors to generate as many false claims as possible, siphoning ever more resources from the government. Though we agree that the number of false invoices presented is hardly a perfect indicator of the relative liability that ought to attach to an FCA defendant, injustice is avoided in the particular case by the discretion accorded the government and a relator to accept reduced penalties within constitutional limits, as ultimately adjudged by the courts.

2.

An important question remains as to whether $24 million is an excessive fine as applied to Gosselin's misconduct in connection with the DPM scheme. According to the Supreme Court, "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." United States v. Bajakajian, 524 U.S. 321, 334 (1998). The test is by no means onerous. A cumulative monetary penalty such as that imposed under the FCA will violate the Eighth Amendment

40

proscription against excessive fines in the infrequent instance that it is "grossly disproportional to the gravity of a defendant's offense." Id.

The defendant in Bajakajian, travelling with his family from the United States to Cyprus, was detained by customs officials in Los Angeles upon being discovered with cash in his possession totalling $357,144. The defendant pleaded guilty to attempting to leave the United States with more than $10,000 without reporting it, see 31 U.S.C. § 5316(a)(1)(A), and the government sought forfeiture of the entire amount. In reviewing the judgment of the Ninth Circuit that the government was entitled to only $15,000, the Supreme Court assessed the gravity of the defendant's offense by its nature and the harm it caused.

In that regard, the Court explained that the defendant's "crime was solely a reporting offense. It was permissible to transport the currency out of the country so long as he reported it." Bajakajian, 524 U.S. at 337. Moreover, the "violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt." Id. at 338. Further, the Court observed, the defendant did "not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." Id. Conviction of the failure-to-report offense carried a term of imprisonment of no longer

41

than six months and a maximum fine of $5,000, "confirm[ing] a minimal level of culpability." See id. at 338-39. Finally, the resultant harm from the defendant's failure to report the cash he was carrying was described as "minimal," with "no fraud on the United States, and . . . no loss to the public fisc." Id. at 339. The Court thus affirmed the judgment of the court of appeals, recognizing that the amount sought was "larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government." Id. at 340.

The circumstances of this appeal could not be more readily distinguishable from those evaluated by the Supreme Court in Bajakajian. Signed into law by President Lincoln in the midst of the Civil War, the FCA was enacted specifically "in response to overcharges and other abuses by defense contractors." Harrison I, 176 F.3d at 784. As a defense contractor, Gosselin is precisely within the class of wrongdoers contemplated by the FCA. Gosselin did not commit some sort of technical offense; its misdeeds were of substance. For analogous misconduct in connection with the ITGBL program as it pertained to the Cartwright Channels, Gosselin was convicted of conspiring to defraud the United States, as proscribed by 18 U.S.C. § 371, and of conspiring to restrain trade, in contravention of 15 U.S.C.

42

§ 1. Those offenses carry maximum prison terms under the pertinent statutes of, respectively, five and ten years.

Though Bunk sought no damages, the question of economic harm to the government arising from the DPM false statements was fiercely contested before the district court. The court ultimately concluded that there was insufficient evidence of any harm, a notion seemingly inconsistent with Gosselin's apparent profit motive in making the statements at issue. The undisputed evidence revealed a substantial short-term price increase under the DPM contract for similar services previously provided, perhaps in excess of $2 million, and there is no doubt that the government has suffered significant opportunity costs from being deprived of the use of those funds for more than a decade.

For purposes of our Eighth Amendment analysis, however, the concept of harm need not be confined strictly to the economic realm. The prevalence of defense contractor scams, as often portrayed in the media, shakes the public's faith in the government's competence and may encourage others similarly situated to act in a like fashion. We made the proper point more than fifty years ago in Toepleman v. United States:

> [N]o proof is required to convince one that to the Government a false claim, successful or not, is always costly. Just as surely, against this loss the Government may protect itself, though the damage be not explicitly or nicely ascertainable. The [FCA] seeks to reimburse the Government for just such losses. For a single false claim[, the civil penalty]

would not seem exorbitant. Furthermore, even when multiplied by a plurality of impostures, it still would not appear unreasonable when balanced against the expense of the constant Treasury vigil they necessitate.

263 F.2d 697, 699 (4th Cir. 1959). Thus, to analyze whether a particular award of civil penalties under the FCA is "grossly" disproportionate such as to offend the Excessive Fines Clause, we must consider the award's deterrent effect on the defendant and on others perhaps contemplating a related course of fraudulent conduct.

Under the circumstances before us, we are satisfied that the entry of judgment on behalf of Bunk for $24 million on the DPM claim would not constitute an excessive fine under the Eighth Amendment. That amount, we think, appropriately reflects the gravity of Gosselin's offenses and provides the necessary and appropriate deterrent effect going forward. To the extent that the district court was of the view that the constitutional threshold could not exceed $1.5 million, we have reviewed its decision de novo, see Bajakajian, 524 U.S. at 336 & n.10, and have come to the different conclusion set forth above.[14]

---

[14] Gosselin interposes a number of arguments to the effect that, for myriad reasons, Bunk and the government are estopped from advocating for a substantial penalty. See Br. for Defendants-Appellees/Cross Appellants at 36-39, 59-65. We have carefully considered each of these arguments, and we reject them.

44

C.

The government appeals the district court's Rule 50(a) determination as to the larger portion of its FCA claim, that is, those aspects of the claim seeking to hold Gosselin liable for its price-fixing conduct affecting all channels with a German terminus. For purposes of this discussion, we exclude the smaller portion of the FCA claim relating to the Cartwright Channels, for which the government has received judgment and has not appealed. See supra note 9. The linchpin of the court's decision was a provision of the Shipping Act of 1984, 46 U.S.C. App. §§ 1701-1719, barring application of the antitrust laws to "any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade." Id. § 1706(a)(4).[15] The court concluded that the provision accurately described Gosselin's agreements and activity to inflate the landed rate, reasoning further "that a false claim under the FCA cannot be predicated on price fixing conduct that

---

[15] The Shipping Act was amended and recodified in 2006, with the result that substantially the same provision now appears at 46 U.S.C. § 40307(a)(5). The referenced exemption applies by its literal terms merely to liability under the antitrust laws, but, strictly for purposes of this decision, we assume that it may also apply to exempt persons from FCA liability.

45

enjoys a statutory immunity from the antitrust laws." J.A. 1137.[16]

In the criminal proceedings pertaining to the Cartwright Channels, during which Gosselin admitted to similar price fixing, we rejected the same immunity argument. See United States v. Gosselin World Wide Moving, N.V., 411 F.3d 502, 509-11 (4th Cir. 2005). Mindful of the canon that exemptions from antitrust liability are to be narrowly construed, our friend Judge Wilkinson reasoned that because Gosselin's "collusive effort was aimed at the entire through transportation market, rather than just the foreign inland segment, we do not think that they can claim exemption." Id. at 510.

Put another way, Gosselin's price-fixing scheme did not inflate in isolation merely the landed rate quoted the freight forwarders; it inflated the all-inclusive through rates that the freight forwarders were induced to bid (and MTMC was compelled to pay) on each of the channels between the United States and Germany. The scheme thus concerned more than just the foreign

---

[16] In deciding the immunity issue, the district court relied in part on the Ninth Circuit's opinion in United States v. Tucor International, Inc., 189 F.3d 834, 836-38 (9th Cir. 1999), wherein the court of appeals declared the defendants immune from antitrust liability pursuant to § 1706(a)(4). The facts and circumstances surrounding Gosselin's case are dissimilar to those in Tucor, which, in any event, is not the law of this Circuit.

inland segments from which the landed rate was derived. That the effect may have been more drastic in the Covan and Cartwright Channels — burdened with the additional encumbrance of Gosselin's bid-rigging efforts — is insufficient reason to segregate the other channels for purposes of the immunity analysis.

Adhering to our decision in the criminal proceedings, the district court correctly granted summary judgment against Gosselin as to liability on that portion of the FCA claim regarding the Cartwright Channels. The court, however, incorrectly ruled as a matter of law in Gosselin's favor on the company's price-fixing conduct affecting the remaining German channels, including the Covan Channels. Gosselin could not have successfully asserted Shipping Act immunity anew to defeat the preclusive effect of our prior judgment, and it should not have been suffered to prevail on the same argument with respect to the nearly identical circumstances presented by the Covan Channels, or to the materially similar circumstances common to all the German channels. The jury should have been allowed to consider the government's entire case, but, inasmuch as it was not so permitted, the verdict in favor of Gosselin must be vacated as infirm. On remand, the district court shall conduct further proceedings, not inconsistent with this opinion, as to the remainder of the government's FCA claim.

47

IV.

Pursuant to the foregoing, the judgment of the district court is affirmed as to Gosselin's cross appeal. We also affirm the entry of judgment in favor of Bunk, but we reverse and remand the court's entry of no monetary award, instructing it to amend the judgment to award $24 million. Lastly, we vacate the court's judgment in favor of the United States so that it may conduct further proceedings on what remains of the government's FCA claim and reenter judgment as appropriate.

No. 12-1417 <u>AFFIRMED</u>

No. 12-1369 <u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS</u>

No. 12-1494 <u>VACATED AND REMANDED</u>

48

SHEDD, Circuit Judge, concurring in part and dissenting in part:

I concur in all but Part III-C of the majority opinion.  In my view, the district court correctly determined that Gosselin's activity was immunized by the Shipping Act, 46 U.S.C. App. § 1706(a)(4), and I would affirm substantially for the reasons given by the district court.  See United States v. Birkart Globistics GMBH & Co., No. 1:02cv1168 (E.D. Va. Aug. 26, 2011).