# United States Court of Appeals

### For the Eighth Circuit

_____

No. 22-3481

_____

Stephen B. Grant, on behalf of The United States of America and on behalf of the State of Iowa

*Plaintiff - Appellee*

v.

Steven Zorn; Iowa Sleep Disorders Center, P.C.; Iowa CPAP, L.L.C.

*Defendants - Appellants*

_____

No. 22-3591

_____

Stephen B. Grant, on behalf of The United States of America and on behalf of the State of Iowa

*Plaintiff - Appellant*

v.

Steven Zorn; Iowa Sleep Disorders Center, P.C.; Iowa CPAP, L.L.C.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: December 13, 2023
Filed: July 5, 2024
_____

Before SMITH,[1] Chief Judge, GRUENDER and GRASZ, Circuit Judges.
_____

GRUENDER, Circuit Judge.

The False Claims Act ("FCA") and the Iowa False Claims Act ("IFCA") authorize private citizens, known as *qui tam* relators, to recover from those who make false or fraudulent claims for payment to the United States and the State of Iowa respectively. Relator, Stephen Grant, a sleep medicine practitioner, brought this *qui tam* action under the FCA and the IFCA against Steven Zorn, Iowa Sleep Disorders Center ("Iowa Sleep"), and Iowa CPAP. After a bench trial, the district court found that the defendants had submitted 1,050 false claims to the United States and the State of Iowa. The district court subsequently imposed a total award of $7,598,991.50. For the reasons set forth below, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

**I.**

Zorn operated and held substantial ownership interests in Iowa Sleep, a medical practice specializing in sleep medicine, and Iowa CPAP, a medical equipment company. Due to financial difficulties at Iowa Sleep, Iowa CPAP provided loans to Iowa Sleep. Iowa Sleep referred patients to Iowa CPAP for free consultations.

Iowa Sleep accepted state and federal funds for its services through government reimbursement programs like Medicare, Medicaid, and Tricare. The amount that can be billed for services rendered through government healthcare

_____

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

-2-

programs depends on a variety of factors, including the time spent with the patient and the complexity of the visit. The government determines the appropriate amount to be reimbursed based on the "code" billed by the provider. In sleep medicine, claims for initial patient visits are coded from 99201 to 99205, and claims for established patient visits are coded from 99211 to 99215. The last number of a code represents the complexity of the visit. Codes ending in the number "5" (e.g., "99205") are considered the most complex and are reimbursed by the government at a higher rate than any other code.

The Centers for Medicare & Medicaid Services ("CMS") oversees claims submitted to the federal government for reimbursement. CMS contracts with third-party administrators like AdvanceMed to handle claims and review, investigate, and audit payments made on behalf of the federal government. CMS, through AdvanceMed, advises service providers on proper billing practices and may notify service providers of suspected discrepancies between submitted claims and actual services rendered.

In September 2016, AdvanceMed sent a letter to Zorn expressing concern that Zorn was overbilling the government for his services. The letter informed Zorn that, between June 2012 and June 2016, he had billed the majority of his established patient visits at codes 99214 and 99215 and all of his initial patient visits at code 99205. AdvanceMed stated that "[m]ore variety would be expected," and it "would like to educate [Zorn's] office" on proper billing practices.

In January 2018, following an audit of patient records from January 2017 to September 2017, AdvanceMed sent another letter to Zorn. This letter informed Zorn that AdvanceMed had "identified overpayments made to" him. The letter suggested that Zorn "[c]onsider and implement corrections to billing procedures that could prevent such errors in the future."

Grant practiced sleep medicine at Iowa Sleep and held 10% ownership interests in both Iowa Sleep and Iowa CPAP. Grant obtained copies of the

AdvanceMed letters through Iowa Sleep's office manager. He became concerned that "if there were any forensic ramifications from [Zorn's overbilling], it would fall squarely on [Grant], as well as the knowledge that Dr. Zorn was doing this and [Grant] was not doing anything about it."

In March 2018, Grant filed this *qui tam* action on behalf of the United States and the State of Iowa (collectively, "the government") against Zorn, Iowa Sleep, and Iowa CPAP, alleging the defendants had violated the FCA and the IFCA by knowingly overbilling the government for initial and established patient visits. *See* 31 U.S.C. § 3729(a)(1); Iowa Code § 685.2. He further alleged that the defendants had violated the FCA and the IFCA by knowingly soliciting and directing referrals from Iowa Sleep to Iowa CPAP in violation of the Anti-Kickback Statute and the Stark Law. *See* 42 U.S.C. §§ 1320a-7b(b)(2)(A), 1395nn(a)(1)(A). The government declined to intervene in the action. *See* 31 U.S.C. § 3730(b)(2); Iowa Code § 685.3(2)(b).

Zorn fired Grant from Iowa Sleep in September 2018. Grant subsequently amended his complaint to include a claim for retaliation under the FCA and the IFCA against Iowa Sleep. *See* 31 U.S.C. § 3730(h); Iowa Code § 685.3(6). He alleged that Zorn fired him for reporting potential FCA and IFCA violations to the government.

During discovery, Grant requested 1,167 medical files from the defendants. Believing Grant's request to be too burdensome, the defendants asked Richard Braak, a certified public accountant, to randomly select thirty-one patient files from a list of Zorn's patient files. Braak randomly chose thirty-one files, all of which pertained to initial patient visits, and the defendants provided these thirty-one files to Grant.

Instead of asking the district court to compel the defendants to produce additional patient files, Grant retained Ted Lodden, a certified public accountant, to determine whether the thirty-one file sample size provided by the defendants was

representative of Zorn's entire billing practice. Lodden did not independently calculate the statistical validity of the thirty-one file sample size. Nevertheless, he testified that extrapolation from the thirty-one files to the entirety of Zorn's billing practice was appropriate.

The defendants subsequently filed a motion to exclude Lodden's testimony under *Daubert* and Federal Rule of Evidence 702. They asserted that Lodden's testimony on extrapolation was entirely speculative since it was based on a sample size not proven to be statistically valid. The district court concluded that a statistically valid sample was not necessary for extrapolation in this case and declined to exclude Lodden's testimony.

Grant also retained Nizar Suleman, a sleep medicine physician, as an expert witness. In his expert report, Suleman compared Zorn's billing rates to publicly available data on average billing rates. Suleman concluded that Zorn had overbilled for his services. For their part, the defendants retained James Alexander, a physician and medical coding consultant, as their expert witness. In his expert report, Alexander reviewed the sample of thirty-one patient files and determined that, depending on the amount of services received by patients, either twenty or twenty-four of those files were billed inaccurately.

The defendants filed a motion to exclude Suleman's testimony under *Daubert* and Federal Rule of Evidence 702. In opposition to the defendants' motion, Grant produced a "supplemental" report authored by Suleman. In this additional report, Suleman examined the same thirty-one patient files reviewed by Alexander and concluded that Zorn had overbilled in all thirty-one cases. In their reply brief in support of their motion to exclude Suleman's original testimony, the defendants also argued that Suleman could not testify as to the thirty-one files because his additional report was an untimely and improper rebuttal report. The district court excluded some of Suleman's original testimony. It also concluded that the defendants were not prejudiced by the information contained in Suleman's additional report and declined to exclude it.

The defendants moved for summary judgment, arguing that Grant's claims were barred by the public disclosure provisions of the FCA and IFCA, which prohibit *qui tam* claims based on information available in the public domain. *See* 31 U.S.C. § 3730(e)(4); Iowa Code § 685.3(5)(c). The defendants further argued that they should be awarded summary judgment on the Anti-Kickback Statute and Stark Law claim due to insufficient evidence of an illegal kickback or self-referral scheme. The district court rejected the defendants' public disclosure defense but awarded summary judgment to the defendants on the Anti-Kickback Statute and Stark Law claim.

After a bench trial, the defendants renewed their request to dismiss the claims pursuant to the public disclosure provisions of the FCA and IFCA. The district court rejected this request and instead found the defendants liable on several claims. The district court held that Iowa Sleep had violated the anti-retaliation provisions of the FCA and IFCA by firing Grant. Accordingly, the district court awarded Grant $50,000 in backpay and $300,000 in special damages resulting from emotional distress. The district court, however, declined to award any punitive damages under the anti-retaliation provisions of the FCA and IFCA.

The district court also concluded that the defendants had overbilled on initial patient visits but not on established patient visits. It estimated that 90% of the initial patient claims submitted to the government were false, resulting in a total number of 230 false claims to Medicaid, 764 false claims to Medicare, and 56 false claims to Tricare. The district court held that the 764 false claims to Medicare resulted in actual damages to the government of $86,332. Because the FCA and IFCA provide for treble damages, the district court subsequently trebled the actual damages to $258,996. *See* 31 U.S.C. § 3729(a)(1)(G); Iowa Code § 685.2. The district court, however, did not assess any damages for the false Medicaid or Tricare claims due to a lack of evidence regarding their reimbursement rates.

The FCA and IFCA provide that a person who submits false or fraudulent claims to the government is liable for a civil penalty for each false or fraudulent

claim. *See* 31 U.S.C. § 3729(a)(1)(G); Iowa Code § 685.2. To calculate the civil penalty, the district court assessed statutory per-claim penalties of $5,000 for those violations that occurred on or before November 2, 2015 and statutory per-claim penalties of $12,537 for those violations that occurred after November 2, 2015 for the Medicare, Medicaid, and Tricare claims.[2] This produced a total civil penalty of $7,699,525. Citing the Eighth Amendment's Excessive Fines Clause, the district court reduced the total civil penalty to $6,474,900. As a result, the combined award of treble damages and civil penalties was reduced from $7,958,521 to $6,733,896. The district court thus imposed an award of treble damages and civil penalties twenty-six times the amount of treble damages and seventy-eight times the amount of actual damages.

Grant requested and was awarded attorneys' fees of $432,448.50, costs of $75,786.27, and interest on backpay of $6,860.73. He also requested that, as relator, the district court award him 30% of the treble damages and civil penalty. *See* 31 U.S.C. § 3730(d)(2) (providing that relators in non-intervened *qui tam* actions are entitled to "not less than 25 percent and not more than 30 percent of the proceeds of the action"); Iowa Code § 685.3(4)(b). The district court held that Grant was entitled to 30% of the treble damages and civil penalty and thereby awarded him an additional $2,020,168.80. Pursuant to an agreement between the United States and the State of Iowa, the remaining balance of $4,713,727.20 would be remitted solely to the United States.

In total, the defendants were held liable for backpay plus interest of $56,860.73, special damages of $300,000, treble damages of $258,996, an adjusted civil penalty of $6,474,900, attorneys' fees of $432,448.50, and costs of $75,786.27. Combining these amounts produced a total award of $7,598,991.50.

---

[2]We take no position on whether civil penalties under the FCA and IFCA can be assessed without an underlying finding of actual damages on the Medicaid and Tricare claims. The defendants did not brief the issue. *See Allison v. Dep't of Corr.*, 94 F.3d 494, 497 n.1 (8th Cir. 1996).

## II.

On appeal, the defendants assert Grant's claims are barred by the public disclosure provisions of the FCA and IFCA, the district court should have excluded Suleman's testimony regarding the thirty-one patient files, and the district court should have excluded Lodden's testimony on extrapolation. Grant cross-appeals, asserting the district court should have found defendants liable for overbilling on established patient visits, the district court erred in granting summary judgment on the Stark Law and Anti-Kickback Statute claim, and the district court should have awarded Grant punitive damages under the anti-retaliation provisions of the FCA and IFCA. Both parties take issue with the district court's determination of damages and civil penalties.

## A.

### 1.

We begin by addressing the defendants' challenge to the district court's denial of their public disclosure defense. The defendants assert Grant's *qui tam* action is barred because the AdvanceMed letters publicly disclosed the defendants' fraudulent billing practices prior to Grant bringing suit. We review *de novo* the district court's determination regarding the applicability of the public disclosure bar. *U.S. ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 692 (8th Cir. 2014).

The public disclosure provisions of the FCA and IFCA bar a *qui tam* action whenever a *qui tam* relator brings suit based on information available in the public domain, unless the relator is an "original source of the information." 31 U.S.C. § 3730(e)(4); Iowa Code § 685.3(5)(c). A relator brings suit based on information available in the public domain when "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A). The public disclosure bar aims

-8-

to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010).

We conclude the public disclosure bar is inapplicable because Grant's complaint did not allege "substantially the same allegations" contained in the AdvanceMed letters.[3] To establish liability, Grant was required to prove that the defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A); Iowa Code § 685.2. In line with this objective, Grant's complaint alleged that the defendants *knowingly* submitted false claims to the government. The AdvanceMed letters, however, revealed only the possibility of inaccurate billing. They did not disclose that the fraudulent actions had occurred. *See U.S. ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1513 (8th Cir. 1994) (finding the public disclosure bar to be inapplicable when the publicly available information "fail[ed] to suggest to the uninitiated reader . . . that [the defendant's] pension liability was *intentionally* understated" (emphasis added)).

Even though the AdvanceMed letters failed to accuse expressly the defendants of committing fraud, the defendants contend that the public disclosure bar should still be given effect as the letters contained the "essential elements comprising [the] fraudulent transaction[s] . . . so as to raise a reasonable inference of fraud." *Id.* at 1514. To the contrary, an uninitiated reader of the AdvanceMed letters would infer that the defendants had acted without the requisite scienter. The September 2016 letter instructed the defendants to use the information in the letter "to determine whether corrections to [their] billing and claim submission procedures [would be] required to prevent future errors." It offered to "educate" Zorn's office on proper billing practices. The January 2018 letter included information on proper billing procedures and asked the defendants to "[c]onsider and implement corrections to

---

[3]We do not address whether the AdvanceMed letters constitute a public "Federal report, hearing, audit, or investigation."

billing procedures that could prevent such errors in the future." Given the letters repeated references to the defendants' "errors" and the accompanying offers for remedial education, an uninitiated reader would not reasonably infer from the letters that the defendants had committed fraud. The district court thus properly rejected the defendants' public disclosure defense, and we need not decide whether Grant qualifies as an "original source."

2.

Next, the defendants contend the district court improperly admitted Suleman's testimony, first articulated in his additional report, that the defendants had overbilled on all thirty-one patient files. The defendants assert the additional report was an untimely and improper rebuttal report, the introduction of which prejudiced them at trial. Because the defendants filed a motion to exclude Suleman's testimony, which the district court denied, we review the district court's evidentiary ruling for an abuse of discretion. *See United States v. Flenoid*, 415 F.3d 974, 976 (8th Cir. 2005). A district court abuses its discretion when it bases its decision "on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 969 (8th Cir. 2023).

Federal Rule of Civil Procedure 26(e) requires a party to supplement a previous disclosure if they learn "that in some material respect the disclosure . . . [was] incomplete or incorrect." This duty to supplement a prior disclosure extends to information included in expert reports and given during expert depositions. Fed. R. Civ. P. 26(e)(2). Parties must submit these supplemental expert disclosures "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.* If a party fails to timely disclose or supplement a report, then "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure [to produce the report] was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).

Grant was required to supplement expert reports by July 1, 2020 and submit rebuttal expert reports by December 23, 2020. He did not submit Suleman's additional report until January 6, 2021. Despite this untimely submission, Grant could rely on the information first articulated in Suleman's additional report at trial if the failure to produce it was "substantially justified or harmless." *Id.* Here, the district court extended the expert deposition deadline to allow the defendants to depose Suleman about the additional report. In addition, Suleman's additional report was based entirely on data provided by the defendants themselves. We therefore discern no abuse of discretion in the district court's determination that the defendants were not prejudiced by the information first articulated in the additional report.

3.

The defendants also take issue with Lodden's testimony that extrapolation from the sample of thirty-one patient files provided by the defendants to the entirety of Zorn's billing practice was appropriate. They assert that, under Federal Rule of Evidence 702 and *Daubert*, which prohibit reliance on unreliable scientific evidence, Lodden should have been precluded from testifying on statistical sampling and extrapolation, as he did not independently calculate the statistical validity of the thirty-one file sample size. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is . . . reliable."). Because the defendants filed a motion to exclude Lodden's testimony, which the district court denied, we review the district court's admission of Lodden's testimony for an abuse of discretion. *See Flenoid*, 415 F.3d at 976.

Although a statistical analysis regarding the validity of a thirty-one sample size would have been preferable, we cannot say the district court abused its discretion in allowing Lodden's testimony. The concerns underlying *Daubert* exclusion of dubious scientific testimony are less stringent in a case such as this one, which involved a bench trial where the judge served as both factfinder and gatekeeper of evidence. *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d

604, 613 (8th Cir. 2011) ("The district court's gatekeeping function under *Daubert* ensures that expert evidence submitted *to the jury* is sufficiently relevant and reliable, but there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." (citations and internal quotation marks omitted)). Lodden explained that, based on the AdvanceMed letters, the reports by Suleman and Alexander, and Braak's use of random selection, he believed the thirty-one files provided by the defendants were chosen from a "homogeneous population." Because the thirty-one files were randomly chosen from a homogeneous population and thirty-one "is a common sample size when [dealing with] a population of a thousand," Lodden testified that extrapolation was appropriate. Despite any statistical deficiencies in Lodden's testimony, we cannot say it was entirely "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Lancaster*, 75 F.4th at 970-71 (noting that expert testimony is unreliable when the expert's opinion is "speculative"). We discern no abuse of discretion.

B.

1.

Turning now to the cross-appeal, Grant contends the district court also should have found the defendants liable for overbilling on established patient visits. He claims there existed sufficient evidence showing the defendants fraudulently overbilled the government on those codes as well. Following a bench trial, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Kaplan v. Mayo Clinic*, 847 F.3d 988, 991 (8th Cir. 2017).

Here, Grant failed to present any evidence showing the defendants submitted false or fraudulent documentation to the government for established patient visits. Grant cannot rely on the sample of thirty-one patient files as evidence of liability for established patient visits because all thirty-one files pertained to *initial* patient visits. As the district court noted, "[a]lthough the Court has found that extrapolation from the 31 chart sample is appropriate for charts coded 99205, extrapolation is not

-12-

warranted for entirely different codes, where no patient charts were ever examined by any expert witness." Although Grant asserts there is no reason to distinguish between initial and established patient visits, Suleman testified that, unlike initial patient visits, most established patient visits are routinely billed at the highest coding levels. In light of this testimony, one cannot necessarily infer the defendants fraudulently overbilled the government on established patient visits just because they did so on initial patient visits. Therefore, the district court did not err in declining to find liability on established patient visits.

2.

Grant asserts the district court erred in granting summary judgment to the defendants on the Anti-Kickback Statute and Stark Law claim because he presented sufficient evidence of an illegal kickback and self-referral scheme. We review *de novo* the district court's grant of summary judgment. *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1051 (8th Cir. 2002). Summary judgment is proper if, "taking the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

The Anti-Kickback Statute prohibits medical providers from knowingly or willfully paying another "to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). The Stark Law prohibits physicians from making a referral to an entity for "the furnishing of designated health services" if the referring physician has a nonexempt "financial relationship" with that entity. 42 U.S.C. § 1395nn(a)(1)(A).

Neither the Anti-Kickback Statute nor the Stark Law provide for a private right of action. They are criminal statutes. Therefore, Grant sued the defendants for violations of these statutes under the FCA and the IFCA, claiming the defendants'

violations of these statutes resulted in the submission of fraudulent claims to the government. Although Grant presented evidence that a kickback or self-referral scheme existed between Iowa Sleep and Iowa CPAP, he failed to present evidence that any purported violations of the Anti-Kickback Statute or the Stark Law resulted in the submission of false or fraudulent claims to the government. The mere existence of a kickback or self-referral scheme does not establish liability under the FCA or the IFCA. The "*sine qua non*" of an FCA or IFCA violation is "the act of submitting a fraudulent claim to the government." *U.S. ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 739-40 (8th Cir. 2014) (rejecting the plaintiff's argument "that, if [the defendant] compensated physicians for illegal referrals in violation of the federal Stark and Anti-Kickback statutes, every claim submitted for services provided by those physicians would be a false or fraudulent claim under the FCA"); *see U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 n.1 (8th Cir. 2014). Summary judgment was therefore proper.

3.

Grant asserts the district court should have awarded him punitive damages under the anti-retaliation provisions of the FCA and IFCA. We review the district court's denial of punitive damages for an abuse of discretion. *McAdoo v. Martin*, 899 F.3d 521, 525 (8th Cir. 2018).

According to Grant, punitive damages are available under the FCA because the FCA provides relief "shall include reinstatement[,] . . . 2 times the amount of back pay, interest on the back pay, and compensation for any special damages." 31 U.S.C. § 3730(h)(2). Grant contends the word "include" denotes a non-exhaustive list of recoverable damages that includes punitive damages. In declining to award Grant punitive damages under the FCA, the district court stated that the double backpay award "signals an intent by Congress to impose punitive relief." The district court held that an award of punitive damages would render the double backpay award superfluous. In light of this double backpay provision, we cannot say the district court abused its discretion in declining to award punitive damages.

Grant fails to cite any cases specifically holding that punitive damages are available under the FCA's anti-retaliation provision.

Grant contends punitive damages are available under the IFCA because Iowa law provides "[i]n a trial of a claim involving the request for punitive or exemplary damages, the court . . . shall make findings, indicating . . . [w]hether . . . the conduct of the defendant . . . constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). Even if we were to assume that Iowa Code § 668A.1(1)(a) is applicable to the instant case, the statute only requires the district court "make findings" as to the defendant's conduct. It does not mandate the district court actually impose punitive damages. Therefore, the district court did not act inconsistently with Iowa Code § 668A.1(1)(a) in declining to award Grant punitive damages under the IFCA. We discern no abuse of discretion.

## C.

The defendants and Grant both challenge the district court's determination of damages and civil penalties. Following a bench trial, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Kaplan*, 847 F.3d at 991.

## 1.

The defendants assert the district court should not have estimated the number of false claims because damages must be "proved with mathematical precision . . . through an expert statistician utilizing reliable sampling methodology." However, in cases involving the FCA and the IFCA, "the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas." *U.S. ex rel. Zissler v. Regents of the Univ. of Minn.*, 154 F.3d 870, 873 (8th Cir. 1998); *see Thayer*, 765 F.3d at 916 n.1. We thus reject the defendants' contention that damages be proved with mathematical precision.

2.

Grant contends the district court should have applied a civil penalty of $5,500 for each false claim that occurred on or before November 2, 2015 to account for inflation. Under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, civil monetary penalties must be adjusted for inflation. Pub. L. No. 114-74, § 701 (codified at 28 U.S.C. § 2461 note). For "all violations occurring on or before November 2, 2015," the minimum penalty for FCA violations was raised "from $5,000 to $5,500." 28 C.F.R. § 85.3(a)(9). Here, the district court imposed a minimum penalty of $5,000 for those violations occurring on or before November 2, 2015. The district court should have determined a minimum penalty of $5,500 for each false claim.

3.

Both parties assert the district court misapplied the Eighth Amendment's Excessive Fines Clause. Grant asserts the district court should not have remitted the original award of treble damages and civil penalties from $7,958,521 to $6,733,896. The defendants claim the treble damages and civil penalties award of $6,733,896 still violates the Excessive Fines Clause.

The Eighth Amendment prohibits the imposition of "excessive fines." U.S. Const. amend. VIII. The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 329 (1998) (internal quotation marks omitted). The FCA's combination of treble damages with per-claim penalties constitutes a punitive sanction that falls within the reach of the Excessive Fines Clause. *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014).

As a threshold matter, we must determine whether the Excessive Fines Clause applies in *qui tam* actions where the government has chosen not to intervene. The Supreme Court has declined to answer this question. *See Browning-Ferris Indus.*,

*Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 275 n.21 (1989). We also have not conclusively answered this question. In a *qui tam* action in which the government declined to intervene at the district court, we stated that FCA penalties fall within the reach of the Excessive Fines Clause; however, we ultimately decided the case on a different issue. *See Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003).

One of our sister circuits, however, has answered this question in the affirmative. In *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021), the Eleventh Circuit noted that the Excessive Fines Clause "applies only to payments imposed by the United States (or the States) and payable to it (or them)." The Eleventh Circuit held that the monetary awards in non-intervened *qui tam* actions are "payable" to the government because the government shares in the proceeds of the action. *Id.* The monetary awards in non-intervened *qui tam* actions are also "imposed" by the government because the government maintains "sufficient control" over the action. *Id.* at 1310. For example, the government retains the right to request to intervene at any time, can obtain a stay of discovery, and can settle the action notwithstanding the objections of the relator. *Id.* at 1311. Even though the government is not a formal party to a non-intervened *qui tam* action, "it remains a real party in interest." *Id.* at 1309-10. Because the monetary awards in non-intervened actions are imposed by the government and payable to it, the Eleventh Circuit held that the damages and statutory penalties awarded in non-intervened *qui tam* actions are subject to the Excessive Fines Clause. *Id.* at 1314. We see no reason to depart from *Yates* in this regard and likewise hold that the Excessive Fines Clause applies in non-intervened *qui tam* actions.

Having determined that the Excessive Fines Clause applies in non-intervened *qui tam* actions, we next address whether the punitive sanction imposed by the district court is "excessive." A punitive sanction under the FCA is "excessive" when it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. Proportionality is determined by a variety of factors, including the reprehensibility of the defendant's conduct, the relationship between the penalty and the harm to the victim, the sanctions in other cases for comparable misconduct,

legislative intent, and the defendant's ability to pay. *Aleff*, 772 F.3d at 512. The plaintiffs assert, and the defendants accept, that cases analyzing punitive damages under the Due Process Clause are instructive in analyzing punitive sanctions under the Excessive Fines Clause. Indeed, in *Aleff*, we applied due process principles from *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), to evaluate the constitutionality of a punitive sanction under the Excessive Fines Clause. *See* 772 F.3d at 512-13; *see also U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387-90 (4th Cir. 2015) (concluding that a punitive sanction was constitutional under both the Due Process Clause and the Excessive Fines Clause after conducting a due process analysis); *United States v. Rogan*, 517 F.3d 449, 454 (7th Cir. 2008) (noting, in the context of an Excessive Fines Clause challenge, that the punitive sanction imposed by the district court was "less than four times actual damages, [which is] well within the single-digit level that *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003), thinks not 'grossly excessive' for punitive damages" and that "[i]t's hard to see why the [Supreme] Court's approach to punitive damages under the Fifth Amendment would differ dramatically from analysis under the Excessive Fines Clause").

We conclude the punitive sanction imposed by the district court violates the Excessive Fines Clause, and we discern two errors in the district court's analysis. First, the district court should not have used the entire treble damages amount of $258,996 as the representative amount of "the gravity of [the defendants'] offense." *Bajakajian*, 524 U.S. at 334. The "gravity of [the defendants'] offense" refers to the amount of compensatory damages and does not include a punitive portion. *See State Farm*, 538 U.S. at 425 ("[A]n award of more than four times the amount of *compensatory damages* might be close to the line of constitutional impropriety." (emphasis added)). Although the Supreme Court has recognized that treble damages have a compensatory aspect "beyond the amount of the fraud," it has also noted that treble damages serve "punitive objectives." *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119, 130 (2003). Therefore, the difference between the amount of treble damages ($258,996) and the amount of actual damages ($86,332) is a hybrid of compensatory and punitive damages. *See Drakeford*, 792 F.3d at 389 ("[T]he

additional sum . . . resulting from the trebling of actual damages is a hybrid of compensatory and punitive damages.").[4] The district court improperly inflated the amount of compensatory damages by using the entire amount of treble damages as its baseline. It should have instead removed the punitive portion from its analysis.

The Supreme Court has not provided guidance as to the exact division between compensatory and punitive damages in a treble damages award. However, it has noted that the government's injury includes not merely the amount of the fraud itself, but also "the costs, delays, and inconveniences occasioned by fraudulent claims." *Cook County*, 538 U.S. at 130. According to the Supreme Court, "[t]he most obvious indication that the treble damages ceiling has a remedial place . . . is its *qui tam* feature with its possibility of diverting as much as 30 percent of the Government's recovery to a private relator who began the action." *Id.* at 131; *see Drakeford*, 792 F.3d at 389 (holding to be compensatory at least the portion of the trebled award allocated to the relator). We decline to decide the exact amount of compensatory damages and instead leave to the district court the task of determining that amount in the first instance. *See Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017) ("[W]hen it would be beneficial for the district court to consider an alternative argument in the first instance, we may remand the matter to the district court.").

The second error we discern is the imposition of a punitive sanction twenty-six times the amount of treble damages and seventy-eight times the amount of actual damages awarded. The Supreme Court has stated that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425. In addition, "[t]he most important indicium of the reasonableness of a punitive damages award is the degree

---

[4]We are aware the amounts of treble and actual damages may be higher than $258,996 and $86,332 respectively considering the district court did not assess any damages for the false Medicaid or Tricare claims. However, Grant failed to present any evidence regarding the reimbursement rates for such claims. Therefore, $258,996 and $86,332 are the relevant amounts for our purposes here.

of reprehensibility of the defendant's conduct," and the Supreme Court has held that purely economic harm, as here, is less reprehensible than "tortious conduct [that] evince[s] an indifference to . . . the health or safety of others." *Id.* at 419. Although we have previously upheld double-digit multipliers in *Adeli v. Silverstar Automotive, Inc.*, 960 F.3d 452 (8th Cir. 2020), and *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024 (8th Cir. 2000), we cannot say the defendants' conduct here was as reprehensible as the defendants' conduct in those cases. In *Adeli* and *Grabinski*, the defendants engaged in tortious conduct that evinced an indifference to the health or safety of others. The defendants here caused a relatively small amount ($86,332) of only economic loss and did not endanger the health or safety of others. Even though Grant asserts the defendants engaged in tortious conduct by destroying medical records, contriving false diagnoses, and declining to consider treatment alternatives, Grant does not cite any record support for these allegations. While these injuries "were theoretically possible," we "cannot let the imagination run wild" in terms of speculated harm. *Adeli*, 960 F.3d at 462-63. We thus conclude this case is unlike *Adeli* and *Grabinski* and that the imposition of a double-digit multiplier is unwarranted under these facts. *See State Farm*, 538 U.S. at 425 (stating that "few awards exceeding a single digit ratio between punitive and compensatory damages, to a significant degree," are constitutional); *see also Solem v. Helm*, 463 U.S. 277, 294 (1983) (acknowledging that decisions involving line-drawing are "troubling" but that "courts are constantly called upon to draw . . . lines in a variety of contexts").

Our conclusion is supported by circuit precedent. In a comparable case involving the FCA, where the defendants similarly caused only economic loss, we upheld a punitive sanction 4.3 times the amount of actual damages and 1.4 times the amount of treble damages. *See Aleff*, 772 F.3d at 513. In justifying this punitive sanction, we reasoned that the defendants' scheme to defraud the government spanned two states and more than six years. *Id.* at 512-13. The defendants received $303,890 to which they were not entitled. *Id.* at 513. Due to the defendants' wrongful conduct, the government "had to bear the cost of investigating the fraud and suffered damage to the integrity of one of its programs." *Id.* Based on these

comparable facts, we conclude the district court should have limited the punitive sanction to a single-digit multiplier of compensatory damages.

The concurrence emphasizes we owe Congress's judgment "substantial deference" and asserts that "fair notice" is a key factor in determining whether a punitive sanction constitutes an excessive fine. We recognize the punitive sanction of $6,733,896 is within the FCA's and the IFCA's statutory limits and that we must accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue. *Grabinski*, 203 F.3d at 1026. However, we must be mindful not to give "undue deference" to legislative judgments about excessiveness. *Yates*, 21 F.4th at 1323 (Newsom, J., concurring); *see Bajakajian*, 524 U.S. at 336 (noting that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature" but that a statutorily prescribed forfeiture was nonetheless unconstitutional under the Excessive Fines Clause). Otherwise, Congress would in effect be "suppl[ying] an answer to the questions of what a fine should be *and* whether it's excessive." *Yates*, 21 F.4th at 1318 (Newsom, J., concurring)*; see id.* (stating that the Eleventh Circuit's "strong presumption of constitutionality" had created a dynamic that was "strange for much the same reason that it would be odd . . . to presume that a police officer's use of force wasn't excessive simply because he said so").[5]

Rather, in determining the constitutionality of a punitive sanction, the reprehensibility of the defendant's conduct is the "most important indicium." *State Farm*, 538 U.S. at 419. We do not mean to suggest the defendants' conduct here was not reprehensible. The defendants received money to which they were not entitled and damaged government programs. Nevertheless, the defendants caused a modest amount of economic loss. A "more modest punishment for this

---

[5]Unlike the Eleventh Circuit, we are not bound by our precedents to maintain a "hyper-deferential posture toward Congress's judgments about excessiveness." *Id.* at 1318; *see, e.g.*, *United States v. Lippert*, 148 F.3d 974, 977 (8th Cir. 1998); *Aleff*, 772 F.3d at 512-13.

reprehensible conduct could have satisfied the [government's] legitimate objectives." *Id.* at 419-20.

### III.

For the foregoing reasons, we vacate the punitive sanction and remand with directions to apply a baseline civil penalty of $5,500 for those violations that occurred on or before November 2, 2015, determine the amount of treble damages that is compensatory and the amount that is punitive, ensure the punitive sanction falls within an appropriate single-digit multiplier of the amount of compensatory damages, and enter judgment accordingly. The judgment of the district court is otherwise affirmed.

SMITH, Chief Judge, concurring in part and concurring in the judgment.

I join the court's opinion, except for Section II(C)(3) and Part III. I agree that the district court misapplied the Eighth Amendment's Excessive Fines Clause, and I agree with vacatur of the civil penalties award and with remand, but I would do so for different reasons. In the majority's view, the Excessive Fines Clause requires a downward adjustment of the False Claims Act's (FCA) civil penalties to a single-digit ratio. In my view, no adjustment is required. At least on this record, the FCA's civil penalties are not excessive. I would direct the district court to increase the civil penalties award to the minimum amount that the FCA prescribes.

The current version of the FCA declares that persons who knowingly defraud federal programs should pay treble damages and a per-claim civil penalty of $5,000 to $10,000 (adjusted for inflation). 31 U.S.C. § 3729(a)(1). Here, the trier of fact found that Steven Zorn and his businesses (collectively, "Zorn") knowingly defrauded three federal programs—Medicare, Medicaid, and Tricare—1,050 times. Thus, in addition to treble damages, the FCA requires Zorn to pay civil penalties between $5.25 million and $10.50 million (plus inflation adjustments).

Circuit precedent describes the FCA's civil penalties as "punitive in nature" and reviewable under the Excessive Fines Clause. *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014). A court should reduce these penalties if they are "grossly disproportional to the gravity of a defendant's offense." *Id.* (internal quotation marks omitted). "Proportionality is determined by a variety of factors, including the reprehensibility of the defendant's conduct; the relationship between the penalty and the harm to the victim; and the sanctions in other cases for comparable misconduct." *Id.* Civil penalties "within the FCA's statutory limits," or "less than [the] statutory maximum," are generally not excessive. *See id.* at 513.

In Eighth Amendment cases, we must remain mindful "that judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). When Congress specifies a penalty, we owe its judgment "substantial deference." *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996)). "The Supreme Court long ago declared that damages awarded pursuant to a statute violate [the Constitution] only if they are 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Capitol Recs., Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012) (quoting *St. Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)). We will set aside an award as "grossly excessive" only if it "'shock[s] the conscience' of the court or 'demonstrate[s] passion or prejudice on the part of the trier of fact.'" *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 815 (8th Cir. 2017) (quoting *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012)). The court will properly "reduce[] a verdict only in rare situations where there is 'plain injustice or a monstrous or shocking result.'" *Ondrisek*, 698 F.3d at 1027 (quoting *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984)).

The standard for assessing shock value is a dim and dotted line in Eighth Amendment jurisprudence. Supreme Court precedent points in two directions.[6]

---

[6]In practice, laws made by Congress rarely violate the Eighth Amendment. A penalty imposed by an act of Congress has shocked the Supreme Court's conscience

*Compare United States v. Tsarnaev*, 595 U.S. 302, 319–20 (2022) (evaluating an Eighth Amendment claim with reference to the government's "traditional authority"); *Timbs v. Indiana*, 586 U.S. 146, 151–53 (2019) (tracing the ban on excessive fines to medieval England and concluding that "the protection against excessive fines has been a constant shield throughout Anglo-American history"), *with Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) ("The [Eighth] Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society." (cleaned up)); *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent. We have pinpointed that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." (cleaned up)). Regardless of which approach is better law, Zorn's civil penalties do not clearly offend historical or evolving standards.[7]

---

only twice. *See Bajakajian*, 524 U.S. at 337 (invalidating as excessive the forfeiture of $357,144 cash after an international traveler did not report the sum to customs inspectors); *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion) (invalidating as cruel and unusual the denaturalization of a military deserter).

[7]The FCA and its robust civil penalties find support in English and American history and in modern federal and state legislation. *See* Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 83–101 (discussing the history of qui tam actions); Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296–97 & n.104 (1989) (collecting pertinent acts of Congress from the 1790s); Kenneth Mann, *Punitive Civil Sanctions: The Middleground Between Criminal and Civil Law*, 101 Yale L.J. 1795, 1844 (1992) ("Legislative adoption of punitive civil sanctions—multiple damages, forfeitures, and penalties—grew rapidly during the middle of the century and has continued to expand in recent years."); Isaac D. Buck, *Side Effects: State Anti-Fraud Statutes, Off-Label Marketing, and the Solvable Challenge of Causation*, 36 Cardozo L. Rev. 2129, 2138 (2015) (observing that "as many as thirty states had false claims acts" in mid-2014). Zorn has not shown that his penalties are excessive compared to historical or contemporary penalties for similar misconduct.

On the contrary, the majority opinion finds that civil penalties of $5.25 million to $10.50 million are excessive in relation to $86,332 in actual damages, or $258,996 in treble damages, that Zorn caused. The majority opinion largely relies on three cases (or their progeny). *See Gore*, 517 U.S. 559; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021). I read these cases differently.

In *Gore*, a car owner sued an automobile distributor, arguing that the company violated Alabama law by maintaining a nationwide policy of making minor repairs to damaged vehicles but then selling those vehicles as new. 517 U.S. at 563–64. An Alabama jury awarded $4,000 in actual damages and $4 million in punitive damages, *id.* at 565, basing the punitive damages on "similar sales in other jurisdictions," *id.* at 567. The Alabama Supreme Court reduced the punitive damages to $2 million. *Id.* The United States Supreme Court granted certiorari and held that $2 million was excessive and arbitrary under the Fourteenth Amendment's Due Process Clause. *Id.* at 568, 585–86. By penalizing the distributor, BMW, for not disclosing minor repairs, Alabama sought to impose its own views about consumer protection on the rest of the country. *Id.* at 568–73, 585. The Court said: "[W]hile we do not doubt that Congress has ample authority to enact such a policy for the entire Nation, it is clear that no single State could do so, or even impose its own policy choice on neighboring States." *Id.* at 571 (footnote omitted). The $2 million award was arbitrary because Alabama never gave BMW fair notice that it would consider out-of-state conduct. *Id.* at 572–74 & nn.20–21. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574. "[T]hat BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose for adhering to the nondisclosure policy . . . [led the Court] to the conclusion that the $2 million award against BMW [was] grossly excessive . . . ." *Id.* at 574–75.

---

*See Aleff*, 772 F.3d at 512 (identifying "the sanctions in other cases for comparable misconduct" as an important factor in our proportionality analysis).

In *State Farm*, a husband and wife sued their automobile insurer, State Farm, in Utah state court following a serious car accident and insurance dispute. 538 U.S. at 412–14. The couple argued not only that State Farm personally wronged them but also that State Farm had "a national scheme to meet corporate fiscal goals by capping payouts on claims company wide." *Id.* at 415 (internal quotation marks omitted). At trial, they presented evidence about "State Farm's business practices for over 20 years in numerous States." *Id.* "The jury awarded the [couple] $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively." *Id.* "The Utah Supreme Court . . . reinstated the $145 million punitive damages award." *Id.* The United States Supreme Court granted certiorari and held that the award was "grossly excessive or arbitrary" under the Fourteenth Amendment's Due Process Clause. *Id.* at 416, 429. Quoting *Gore*, the Court reiterated that punitive damages may not be imposed without "fair notice." *Id.* at 417 (quoting *Gore*, 517 U.S. at 574). "[P]unitive damages," the Court said, "pose an acute danger of arbitrary deprivation of property" because "[j]ury instructions typically leave the jury with wide discretion in choosing amounts." *Id.* (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994)). "[A]s a general rule," a state does not have a legitimate interest "in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *Id.* at 421. To the extent a state court may seek to hold a defendant accountable for out-of-state conduct, it "would need to apply the laws of the[] relevant jurisdiction[s]," not its own state's laws. *Id.* at 421–22.

*Gore* and *State Farm* are readily distinguishable from this case. Those cases concerned the Due Process Clause; this case concerns the Excessive Fines Clause. Those cases were about the extraterritorial application of state law; this case is about the domestic application of federal law. Those cases involved punitive damages awarded by juries; this case involves civil penalties determined by Congress. And most notably, this case does not raise fair notice concerns.

"Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may

impose." *Gore*, 517 U.S. at 574. Zorn chose to participate in Medicare, Medicaid, and Tricare and voluntarily submitted to the laws and regulations that govern these programs. If he wanted to know the severity of penalties imposed on persons who knowingly submit false claims, he merely needed to consult the statute. *See* 31 U.S.C. § 3729(a)(1). He had fair notice about the potential consequences of his actions. This fair notice diminishes any concern about the civil penalties award being excessive. *See Capitol*, 692 F.3d at 907 ("The Supreme Court never has held that the punitive damages guideposts are applicable in the context of statutory damages. . . . Th[e] concern about fair notice does not apply to statutory damages, because those damages are identified and constrained by the authorizing statute.").

In *Yates*, the Eleventh Circuit confronted the same question presented here. A medical practice tried to defraud Medicare by submitting numerous false claims. 21 F.4th at 1295. A federal jury found 214 violations, resulting in $755.54 in actual damages. *Id.* at 1296. Applying the FCA, the district court trebled those damages to $2,266.62 and imposed inflation-adjusted civil penalties of $1,177,000, the statutory minimum. *Id.* at 1297. On the excessive fines issue, the Eleventh Circuit affirmed. *Id.* at 1314. It acknowledged that a 1,558:1 ratio "may raise an eyebrow." *Id.* However, any excessiveness concerns "are negated when one realizes that this total is the result of [the defendant's] repeated (214) instances of fraud against the United States." *Id.* "Congress, as a representative body, can distill the monetary value society places on harmful conduct . . . ." *Id.* (quoting *United States v. Chaplin's, Inc.*, 646 F.3d 846, 852 (11th Cir. 2011)). "Fraud harms the United States in ways untethered to the value of any ultimate payment." *Id.* at 1316. "Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system." *Id.* (quoting *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003)). When fraud becomes common, it "shakes the public's faith in the government's competence and may encourage others similarly situated to act in a like fashion." *Id.* (quoting *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013)). "'[S]ubstantial penalties,'" the Eleventh Circuit concluded, "'serve as a powerful mechanism to

dissuade' repeated violations of the FCA." *Id.* (quoting *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015)).

*Yates* does not support Zorn's excessive fines defense. *Yates* affirmed a ratio of civil penalties to actual damages of 1,558:1 based on 214 violations totaling $755.54 ($3.53 per violation). The majority opinion directs the district court to reduce Zorn's civil penalties to a single-digit ratio based on 1,050 violations totaling $86,332 ($82.22 per violation). Zorn's fraud surpasses the fraud committed in *Yates*. I would follow the Eleventh Circuit's example and enforce the FCA's minimum civil penalties against Zorn. *See* 31 U.S.C. § 3729(a)(1).

Congress has wide discretion to decide "the most effective way to insure the integrity of federal funds." *United States v. Sabri*, 326 F.3d 937, 944 (8th Cir. 2003), *aff'd*, 541 U.S. 600 (2004). When Congress amended the FCA, it decided that a per-claim civil penalty of $5,000 to $10,000 (adjusted for inflation) was necessary to compensate the government, incentivize qui tam relators, and deter knowing submissions of false claims. *See Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 133 (2003) (describing how Congress's "1986 amendments . . . increased the Government's measure of recovery[] and enhanced the incentives for relators to bring suit"); *Hudson v. United States*, 522 U.S. 93, 102 (1997) ("[A]ll civil penalties have some deterrent effect."); *United States v. Ursery*, 518 U.S. 267, 283–84 (1996) ("Civil penalties are designed as a rough form of 'liquidated damages' for the harms suffered by the Government as a result of a defendant's conduct." (quoting *Rex Trailer Co. v. United States*, 350 U.S. 148, 153–54 (1956))).

"It makes no sense to consider the disparity between 'actual harm' and an award of [civil penalties] when [civil penalties] are designed precisely for instances where actual harm is difficult or impossible to calculate." *Capitol*, 692 F.3d at 907–08. The constitutionality of Zorn's civil penalties should not depend on "a simple mathematical formula . . . that compares actual and potential damages to the [FCA's] punitive award." *Gore*, 517 U.S. at 582 (emphasis omitted). The FCA gave Zorn "fair notice" about the potential consequences of defrauding Medicare, Medicaid, and Tricare. *See id.* at 574. Still, he knowingly submitted 1,050 false claims.

Requiring Zorn to pay the amount that Congress has prescribed is not a "plain injustice or a monstrous or shocking result." *Ondrisek*, 698 F.3d at 1027 (quoting *Vanskike*, 725 F.2d at 1150). "[T]he severity of the penalty" was predictable from Zorn's standpoint, *see Gore*, 517 U.S. at 574, and "is not grossly disproportional" to "the reprehensibility of [his] conduct," *Aleff*, 772 F.3d at 512.

I concur in part and concur in the judgment, but I respectfully decline to join the majority opinion's directions to the district court on remand.

———————————————